**William E. SIMMONS, Petitioner,**

v.

**Charles MEGERMAN, Director of Corrections, Jackson County, Missouri, Respondent.**

**No. WD 39660.**

Missouri Court of Appeals, Western District.

Aug. 11, 1987.

William E. Simmons, Clinton, pro se.

Jane McQueeny, Linda F. Dycus, Kansas City, for respondent.

### ORIGINAL PROCEEDING IN HABEAS CORPUS

Before CLARK, P.J., and TURNAGE and NUGENT, JJ.

CLARK, Presiding Judge.

Petitioner, William E. Simmons, sought a writ of habeas corpus contending his confinement in the custody of the Jackson County Department of Corrections for contempt of court was illegal. The writ issued, return was made and we now order petitioner discharged.

The facts relevant to the order of confinement are drawn essentially from documents and pleadings. In 1982, the marriage between petitioner and Fredalyn Simmons (now Gentry), was dissolved and custody of three children, Jamie, James and John, was awarded to the mother, Fredalyn. In 1986, the decree was modified to transfer custody of James to petitioner. The order entered at that time also specified visitation schedules applicable to all three children. The subsequent problems, which resulted in the citations for contempt, arose over the custody and visitation with the children and petitioner's alleged failure to observe the terms of the 1986 modification order.

The trial court's records disclose, among other entries, issuance of two orders to show cause, one dated February 3, 1987, returnable March 24, 1987, and a second issued June 23, 1987, returnable July 13, 1987. Each order directed petitioner to show cause why he should not be held in contempt of court and each was based on, and incorporated by reference, a motion filed by Fredalyn containing a virtual laundry list of complaints regarding telephone calls made to Fredalyn's house, lapses in payments of child support and omissions by petitioner to abide by the terms of the dissolution decree as modified in the 1986 order, particularly with reference to child custody and visitation. Hearings were not held on either show cause order on the return dates March 24 or July 13. The court's docket entry for March 24 shows "Cause continued" with no date rescheduled. The docket for July 13 shows no entry at all.

Commencing on July 20, 1987, the court conducted a hearing extending from that date to July 23, 1987, on various matters pending in the Simmons dissolution of marriage case. Included were a motion by petitioner to modify the decree, an application by petitioner for a writ to facilitate his exercise of visitation with the child John, a motion by Fredalyn to terminate visitation, a motion by Fredalyn for attorney fees and Fredalyn's previous motions which had prompted issuance of the two show cause orders. After ruling the other motions first, the court on July 23, 1987, orally announced from the bench that petitioner was found in contempt of court and he was remanded to the custody of the Jackson County Sheriff for delivery to the Department of Corrections.

A discussion ensued between counsel for petitioner and the court in an attempt to ascertain what conduct by petitioner had resulted in the finding and judgment of contempt and what acts by petitioner would purge the contempt. As best the court's responses may be interpreted, a

problem generated by the absence of any formal judgment entry, the contempt consisted of petitioner's failure to make the child James available to Fredalyn for summer visitation between June 15 and June 30, 1987 and his failure to return the child Jamie to Fredalyn after petitioner's visitation earlier in June. Counsel pointed out, and the court agreed, that Jamie had been returned to Fredalyn before the hearing and was in her mother's custody.[1] After the pronouncement of the contempt but before the court recessed, the child James was brought into the courtroom and petitioner offered to deliver the boy to Fredalyn for indefinite visitation. The court refused to accept that conduct as sufficient to purge petitioner of the contempt. Petitioner's requests for a stay to permit an appeal and for bail were summarily denied.

Petitioner was taken into custody by respondent Director of Corrections July 23, 1987, on the basis of a form entitled "Notice To Jackson County Department of Corrections," apparently intended for use in criminal cases. A check mark was placed on the form opposite a line stating, "Defendant remanded to the custody of the Jackson County Dept. of Corrections (formal court order to follow)," and the form was signed by Rhonda Smith, apparently a clerk. There was no order signed by the judge, judgment of contempt and no order for commitment apart from the form noted above.

On July 24, 1987, on the verified petition for habeas corpus presented by petitioner, our writ issued and petitioner was ordered released on his own recognizance pending respondent's return to the writ on July 31, 1987. On July 27, 1987, the trial judge entered a formal judgment of contempt, purporting to be as of July 23, 1987, and a warrant for commitment which directed respondent to take petitioner into custody within three days thereafter. We issued our stop order to prevent execution of the warrant.

At the hearing July 31, 1987, respondent agreed that the notice of July 23, 1987, signed by the court clerk was the only basis in hand for detention of petitioner. It also appears undisputed that the children, James and Jamie, were in the actual custody of Fredalyn as of the hour on July 23, 1987, when petitioner was taken into custody.

In cases of contempt not committed in the immediate view and presence of the court, the alleged contemnor is entitled to notice of the accusation and reasonable time to make his defense. *Lake Thunderbird Property Owners Association, Inc. v. Lake Thunderbird, Inc.,* 680 S.W.2d 761, 764 (Mo.App.1984). In a contempt case, the alleged contemnor is entitled to a notice which fairly and fully informs him of the specific acts of contempt with which he is charged. *Curtis v. Tozer,* 374 S.W.2d 557, 589 (Mo.App.1964).

Contempt may be criminal or civil and it may be direct or indirect. Indirect contempt arises from matters not transpiring in court. *Ex parte Ryan,* 607 S.W.2d 888, 890 (Mo.App.1980). The purpose of civil contempt is to remedy, not to punish and is to enforce obedience to a judgment. The sanctions which follow a judgment of civil contempt, being to coerce compliance, necessarily contemplate that the contemnor retains the power to terminate the sanction by the act of compliance. *Wisdom v. Wisdom,* 689 S.W.2d 82, 87 (Mo.App.1985).

Before a person can be punished for contempt, it must appear that there has been an adjudication and conviction or a judgment holding the party guilty of contempt of court. *In re Farmer's Bank of Leeton,* 222 Mo.App. 897, 901, 6 S.W.2d 646, 648 (1928). The adjudication is a conviction and the commitment in consequence thereof is execution. Unless the record shows a judgment of conviction, the commitment has no basis on which to rest. *Ex Parte Brown,* 530 S.W.2d 228, 230 (Mo. banc 1975).

---

1. The ultimate finding of contempt was, as to the child Jamie, at direct variance with the judge's earlier announcement: "[t]herefore, the court, with respect to Jamie, finds that the—there is presently no contempt on the part of respondent."

When a party is jailed for civil contempt, the facts and circumstances upon which the contemnor was so adjudged must be set forth in the judgment finding him in contempt and in the order of commitment. *Owsley v. Owsley,* 693 S.W.2d 897, 899 (Mo.App.1985). A civil contempt is not fully adjudged unless the order of commitment contains a recital of the particular facts and circumstances which constitute the contempt and a declaration of the conditions to be met to purge the contempt and so be free of the commitment. *Brown v. Brown,* 670 S.W.2d 167, 170 (Mo.App. 1984).

From the summary of facts in this case, it is apparent that the trial court was attempting to impose a judgment upon petitioner for indirect civil contempt. As the court expressed itself at the July 23 hearing, "It's not punishment, but rather it's coercive in order to cajole or convince the respondent to comply with the order." The subject of compliance dealt with was the return of the child Jamie from temporary visitation and the delivery of the child James to Fredalyn for her period of visitation.

The proceedings in this case are rife with error and omission. There is no record of any notice to petitioner that the proceeding in contempt would be held on the date evidence was taken, there was no judgment entered of record on the date petitioner was placed in custody, there was no warrant or order of confinement signed by the judge and there was no declaration of conditions to be met by petitioner to purge himself of contempt.

A significant problem in this case was the absence of a formal judgment of contempt and order of commitment entered upon the court's record July 23, 1987, the date petitioner was taken into custody. Indeed, the court's docket shows no judgment recorded at all on that date. Although it would be possible for the court to dictate into the record the content of a judgment of contempt and order of commitment from the bench, assuming the written record appropriately showed entry of judgment accordingly, the same care to include all necessary elements of the judgment and order must be exercised as is employed in drafting a recorded entry. Attempts to announce such a judgment extemporaneously, as was done here, will usually be unsatisfactory.

Petitioner's commitment to custody on July 23, 1987, was unlawful because no judgment of contempt was entered on that date. Moreover, even if the oral pronouncement by the court could be construed to have been a judgment, unrecorded, the order for commitment was invalid because it was not signed by the judge, it failed to set out the facts and circumstances of the contempt and it did not state the conditions to be met for the contemnor to purge himself of the contempt.

We are not unmindful of the court's entry of formal judgment of contempt and warrant for commitment on July 27, 1987, but of course, that judgment provided no basis for confinement of petitioner four days earlier. Even that judgment, however, was deficient for failure to define with any particularity how petitioner could purge himself of the contempt.

A basic flaw in the proceedings was the court's insistence, both at the hearing on July 23 and in the judgment and warrant of July 27, that the required compliance to relieve petitioner of the contempt was his adherence to the terms of the dissolution decree as modified by the order of June 12, 1986. Beyond that generalized statement of an objective, the court refused to enumerate any acts petitioner could perform or refrain from performing which would suffice to accomplish his release. The judgment, even liberally construed as such, found only that petitioner had failed to provide Fredalyn summer visitation with the child James and had failed to return the child Jamie to his mother after petitioner's term of visitation. Quite apparently, petitioner was, on July 23, incapable of doing more to relieve those transgressions of the decree because it was then a fact that Jamie was in her mother's custody and James was made available and was actually given over to Fredalyn for a period of visitation.

 It is fundamental to the coercive concept of civil contempt that a correlation exist between the acts constituting the contempt and the conduct of the contemnor sought to be induced. If the contemnor does in fact hold the keys to his own release, he must first be apprised of the conduct which offended and he must be given to understand what he may do to reform his actions. Petitioner here and his attorney both expressed to the court a willingness to conform to any aspect of the dissolution decree respecting custody and visitation as was specified, but the court found such to be unacceptable. At the same time, the court continued to insist that observance of the terms of the decree was the objective and that petitioner should contact the clerk to obtain a future hearing for the purpose of making a report. We share the concern expressed at the time by petitioner that he did not understand and his attorney did not understand what he was to do. Compliance with the conduct sought to be induced by a contempt judgment should not be a subject for speculation, conjecture or surmise by the contemnor.

 The contempt judgment was also defective and insufficient to support confinement of petitioner in respect to notice. The prior show cause orders of February 3, 1987 and June 23, 1987, which required petitioner's appearance and gave notice of the alleged contempt, lapsed when the court took no action on the return dates, either to hear the cause or continue the hearing to any particular date. There is no record in the court files or in the court's docket of any notice at all to petitioner that a hearing on the contempt charge would be held at any time between July 20 and July 23, 1987. It necessarily also follows that petitioner had no notice of the specific acts of contempt with which he was charged.

It is to be noted, even if the show cause orders which had lapsed were taken to have continuing viability, that neither notice and attachments made any mention of the specific charge which the trial court emphasized in its oral findings, the failure by petitioner to make the child James available for visitation. Petitioner had neither fair nor full nor timely advance notice as to the specific acts of contempt with which he was charged. On this ground alone the judgment and commitment were fatally flawed.

The judgments of July 23 and July 27, 1987, are and were void from inception. Petitioner is ordered discharged.

All concur.