**Angelika Ella (Ford) STUART, Petitioner–Respondent,**

v.

**Mark Shawn FORD, Respondent–Appellant.**

**No. SD 29394.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 21, 2009.

---

Randy S. Anglen, of Randall S. Anglen, P.C., Branson, MO, for Appellant.

Steven Privette, Willow Springs, MO, for Respondent Angelika Ella Ford.

Chris Koster, Attorney General, Jefferson City, and Curtis M. Garner, Assistant Attorney General, Springfield, MO, for Respondent State of Missouri Family Support Division.

GARY W. LYNCH, Chief Judge.

Mark Shawn Ford ("Father") appeals the Judgment of Modification and Contempt and the Commitment Order pursuant to that judgment entered by the trial court in favor of his ex-wife Angelika Ella Ford (now Stuart) ("Mother"). Finding no merit in Father's points, this Court affirms.

### Factual and Procedural Background

Mother and Father's marriage was dissolved by decree dated October 16, 1997, and amended on January 7, 1998. Mother was awarded "sole legal and physical custody" of the parties' two minor children. Pertinent to the issues raised on appeal, Father was ordered to pay to Mother $623 per month for child support, and Mother was awarded, as her share of the marital property, a $21,000 interest-accruing judgment against Father.

In 1999, Father filed a motion to modify custody and child support provisions of the dissolution decree, and the parties have been in court ever since. In September 2001, the State of Missouri's Department of Social Services moved to intervene to protect its rights as an assignee of Moth-

er's child support payments.[1]

Father amended his motion to modify on March 20, 2006, to include a request for retroactive modification or, alternatively, abatement of child support obligations. Three days later, Mother amended her cross-motion to modify and renewed her request for findings of contempt and, in a separate motion, requested an award of attorney fees against Father. Trial was held on July 20, 2006, following which the case was "held open" for proposed judgments, arguments, and briefs.

Over two years later, on August 29, 2008, the trial court issued its Judgment of Modification and Contempt ("Judgment"), awarding the parties custody and visitation in accordance with the parties' stipulation presented at trial, which was limited only to those issues. In addition, the trial court awarded Mother attorney fees and costs in the amount of $20,000.

In the contempt portion of the Judgment, the trial court specifically found, among other findings, that:

> The Court further finds that it has made the following orders on the following dates and that [Father] has willfully and intentionally refused to comply with said orders even though he had the ability to do so:
>
> - January 7, 1998, this Court entered its Amended Judgment ordering [Father], Mark Ford, to pay to [Mother] Angelika (Ford) Stuart the sum of $21,000.00 for her interest in the marital property and that same shall bear interest at the statutory rate from the date of entry until satisfied.

- January 7, 1998, this Court entered its Amended Judgment ordering [Father], Mark Ford, to pay child support in the amount of $623.00, per month commencing November 1, 1997, to the clerk of the Circuit Court of Howell County as Trustee for the minor children.

- July 10, 1998, this Court ordered [Father] to pay to [Mother's] attorney, Steven Privette, attorney fees of $500.00 for various contemptuous behaviors on the part of [Father] which had been tried to the Court.

- December 4, 1998, this Court ordered [Father] to pay to [Mother's] attorney, Steven Privette, additional attorney fees of $500.00 for various contemptuous behaviors on the part of [Father] which had been tried to the Court.

- March 1, 1999, this Court ordered [Father] to pay to [Mother's] attorney, Steven Privette, additional attorney fees of $500.00 for various contemptuous behaviors.

The trial court proceeded to hold Father in contempt for this conduct and ordered that Father could:

purge himself of contempt by:

- remitting the $21,000.00, plus interest calculated at the statutory rate from January 7, 1998, until paid to the Howell County Circuit Clerk's office for distribution to [Mother];

- remitting the arrearage amount of $44,128.95 (as of September, 2006) in child support to the Howell County Circuit Clerk's office;

---

1. Claiming an interest in the outcome of this litigation in that Mother received public assistance from the State of Missouri, the Department of Social Services, Division of Child Support Enforcement, by and through David A. Dykas, Assistant Prosecuting Attorney,

Child Support Enforcement Unit moved to intervene, pursuant to Rule 52.12(a). Both the State of Missouri Family Support Division and Mother filed a brief as Respondent on appeal.

- remitting $1,500.00 in attorney fees directly to [Mother's] attorney, Steven Privette; and

- remitting $20,000.00 in additional attorney fees directly to [Mother's] attorney, Steven Privette.

Further, the trial court ordered that Father

be committed to the custody of the Sherriff of Howell County until he has purged himself of this contempt by payment of the sums set forth above in full, or files a payment plan, approved by the [Mother] and [Mother's] attorney, with the Court, or submitted a plan for repayment of all said amounts which is approved by this Court.

Finally, the trial court stayed this order, referring to it as an "Order of Commitment," "until October 3, 2008, at 1:00 p.m. in order to allow [Father] time to purge himself of his contempt as set out above."

October 3, 2008, passed without Father purging his contempt. Five days later, the trial court executed a written "Commitment Order," which was filed on October 14, 2008. After reciting the purge provisions contained in the Judgment, the Commitment Order found that the judgment of contempt "was stayed until October 3, 2008, at 1:00 p.m. in order to allow [Father] to purge himself of his contempt." The order recites that, according to the Howell County Circuit Clerk, "[Father] has neither remitted the ordered sums nor submitted a payment plan of any kind to the Court and this Court has not received any such plan." The commitment ordered "[Father] committed to the Howell County, Missouri, Jail until such time as he may comply with the Court's orders previously entered herein and as recited above[,]" and ordered the Sherriff of Howell County "to

take [Father] into custody wherever he may be found."

Father appeals, bringing three points challenging four trial court rulings or actions. His first and second points are directed toward the contempt portion of the Judgment and the Commitment Order, while his third point is directed toward the trial court's denial of his request for abatement of child support, pursuant to section 452.340.7.[2] Father's points will be addressed in the order presented, and additional facts will be elicited as necessary to address each point.

## Discussion

### I. Judgment of Contempt and Commitment Order

#### A. Standard of Review

" 'Civil contempt is intended to benefit a party for whom an order, judgment or decree was entered.' " *Garner v. Hubbs,* 17 S.W.3d 922, 929 (Mo.App.2000) (quoting *State ex rel. Chassaing v. Mummert,* 887 S.W.2d 573, 578 (Mo. banc 1994)). " 'Its purpose is to coerce compliance with the relief granted.' " *Id.* In civil contempt cases, the ruling of the trial court will not be disturbed upon review by this Court absent a clear abuse of discretion. *Watkins v. Watkins,* 839 S.W.2d 745, 747 (Mo.App.1992). "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration[.]" *In re Marriage of Wade,* 982 S.W.2d 330, 335 (Mo.App. 1999). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.* "[D]isretionary rulings are presumed cor-

---

**2.** References to statutes are to RSMo Cum. Supp.2005.

rect, and the appellant bears the burden of showing an abuse of discretion." *Id.* A trial court's judgment in a civil contempt proceeding must be affirmed unless there is no substantial evidence to support the judgment, the judgment is against the weight of the evidence, or it erroneously applies or declares the law. *Lyons v. Sloop,* 40 S.W.3d 1, 10 (Mo.App.2001).

"The phrase 'weight of the evidence' means its weight in probative value, rather than the quantity or amount of evidence." *In re Marriage of Altergott,* 259 S.W.3d 608, 613 (Mo.App.2008) (quoting *Simpson v. Strong,* 234 S.W.3d 567, 578 (Mo.App.2007)). "The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief." *Id.* "An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." *Id.*

In its capacity as the trier of fact, it is the duty and function of the trial court to assess the weight and value of each witness's testimony. *O'Dell v. Mefford,* 211 S.W.3d 136, 141 (Mo.App.2007). "[I]n determining whether a judgment is against the weight of the evidence, 'we must give due regard to the trial court's opportunity to judge the credibility of the witnesses.'" *Id.* (quoting *Evans v. Wittorff,* 869 S.W.2d 872, 875 (Mo.App.1994)). The evidence and all reasonable inferences drawn therefrom are viewed in a light most favorable to the trial court's judgment, and all contrary evidence and inferences are disregarded. *O'Dell,* 211 S.W.3d at 141.

B. *Trial Court's determination that Father willfully and intentionally refused to comply with court orders is not against the weight of the evidence*

In his first point, Father contends that he did not purposely violate the trial court's orders and did not have the means necessary to pay, thus it was error and an abuse of discretion for the trial court to hold him in contempt. Father argues that since the dissolution of his marriage to Mother in 1998, his income-producing ability was substantially decreased, and he has been unable to earn what he earned at the time of the dissolution. He attributes this, in part, to "back problems" and "because [Mother] kept filing ex-partes on him, requiring him to miss work."

To establish a prima facie case of civil contempt, the complaining party must prove: "(1) the contemnor's obligation to perform an action as required by the decree; and (2) the contemnor's failure to meet the obligation." *Walters v. Walters,* 181 S.W.3d 135, 138 (Mo.App.2005). "Once a prima facie case of contempt is established, the alleged contemnor bears the burden of proving that he is financially unable to pay and that the inability to pay is not the consequence of his own intentional and contumacious conduct." *Lyons,* 40 S.W.3d at 11. Where the proceeding for civil contempt arises from an alleged failure to comply with a judgment of dissolution, "'the contemnor has the more ready access to any facts to excuse the default[]'" and therefore "bears the burden to prove that the non-compliance was not an act of contumacy.'" *Id.* (quoting *State ex rel. Watkins v. Watkins,* 972 S.W.2d 609, 611 (Mo.App.1998)).

Father does not challenge the trial court's adverse determination on either element of Mother's prima facie case, but rather challenges the trial court's determination that his failures to pay as ordered by the trial court constituted contempt, i.e., were willful and intentional refusals to comply with the court orders, the issue upon which he carried the burden of proof.

Father argues that the trial court abused its discretion in finding him in contempt because "the weight of the evidence proved [he] was unable to earn enough money to live on, due to physical disability, family matters and lack of suitable employments." In making this argument, Father relies almost exclusively upon his trial testimony, which was contrary to the result reached by the trial court, and accords it greater weight than the testimony of the other twelve witnesses who testified and the exhibits admitted into evidence at trial.[3] Father does this without any citation to relevant legal authority as to why the trial court was, or this Court is, required to afford his testimony any credibility or weight at all, much less greater weight than the other witnesses and the exhibits presented at trial. Likewise, Father's brief is devoid of any explicit argument or justification urging this Court to deviate from the applicable standard of review and afford Father's trial testimony credibility and weight which, obviously, the trial court was loath to do.

■ The evidence, when viewed in accordance with the applicable standard of review, *supra*, shows that Father was able to earn substantially more than he reported. Father admitted he quit his job at Stolba Trucking, his employer at the time of the dissolution. He also admitted that, even though he could work and could get a job driving a truck whenever he wanted, he has not sought work in over two years. An average truck driver working for Stolba Trucking earns $800 per week.

After Father quit working for Stolba Trucking, he went to work for his father and uncle at Ozark Style, LLC, a company he helped to set up, driving a truck they bought for him. Neither his father nor his uncle had previously been in the trucking business. His father was served with a subpoena to appear at trial and to bring the records of Ozark Style, LLC. His father did not respond to the subpoena. Father denied having any information as to his father's location on the day of trial.

Father later went to work for Southern Style, LLC, driving a truck, where he is paid "in cash, no receipts." This company was set up by Father's current wife. Father is the sole employee of the company. Father's current wife pays him in cash and, like Father, keeps no receipts. She claims the trucking company is hers but gave no prior experience in the trucking business. She is a registered nurse case manager who works at Community Hospice and earns $16.50 per hour plus mileage. The trucking company's bank account is kept in her name, not in the name of the LLC. It has at least $10,000 available to pay on the judgments "if she chose to loan it to [Father]." Southern Style, LLC, had a net income after expenses and before depreciation of $16,000 for the prior year. Father's current wife was subpoenaed to bring the records of Southern Style, LLC, to trial. Despite having been at every prior hearing and after being subpoenaed, she decided to visit relatives out of state and left town just before trial. The trial court told Father, who claimed

---

**3.** Father accorded such little weight to his own seventeen trial exhibits which were admitted into evidence that he failed to deposit them with this Court as required by Rule 81.16(a) and this Court's Special Rule 4. His exhibits apparently included his Income Tax Returns for 1997 through 2005 and a Child Support *Payment* Summary (emphasis added). "When an exhibit is omitted from the transcript and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant." *In re Marriage of Gourley,* 811 S.W.2d 13, 16 (Mo.App.1991).

References to rules are to Missouri Court Rules (2008).

he had no idea where she was and no way to contact her, that if she did not appear the following morning, she risked incarceration. She appeared the following morning.

In addition to his truck driving skills, Father is a trained machinist. He can repair trucks. He regularly greases, maintains, and cleans the truck he operates. He has also built fences, including setting corner posts, and has torn down barns. He mows yards and maintains his and his father's houses.

He pays no rent, rather "working it out" with his father who owns the house where he lives. The reasonable rental value of his house is $300 to $400 per month. Appellant does not have a bank account, credit card, and had no cash in his pocket at trial, "not a penny." His wife provides his food and clothes. Yet, according to him, he pays his father's telephone and electric bills.

A year and a half after the parties divorced, Father conveyed his interest in a tract of real estate to his parents. He inherited $2,500 upon his mother's death and paid "some bills" but nothing on the judgments. He admits owing $42,982 in child support along with the other judgments. He says he knows he paid $10 on the property judgment and believed he paid more, but could not remember an amount.

Mother repeatedly asked Father to pay the child support and the other judgments, and Father's response on several occasions through the years was that "if [she] could afford to take care of the dog, [she] could ... afford to take care of the kids, and he would starve [her] out, he wouldn't ever pay [her] a red cent, he would give it all to the attorneys before [she'd] ever see anything."

Mother met her burden of proof in establishing that Respondent was ordered to pay child support and pay her for her share of marital property, in addition to attorney fees, and that he had failed to do so. Father admitted as much himself, and does not claim otherwise in this appeal. Once Mother made a prima facie case of contempt, the burden shifted to Father to establish that he was unable to pay and that his inability to pay was not intentional or contumacious. Implicitly, the trial court did not believe Father's testimony regarding his various excuses related to his "physical disability, family matters and lack of suitable employment," and this Court is required to defer to that credibility determination. Thus, the trial court did not abuse its discretion in determining that Father's failure to comply with the court orders constituted contempt because the weight of the evidence, given its credibility determination as to Father's testimony, supported such a contempt finding. Point one is denied.

## C. Challenge to findings in Judgment is not preserved for appellate review

Father's second point relied on challenges both the Judgment for its lack of a finding of his current ability to pay and the Commitment Order because its provisions for purging himself of contempt are vague. Initially, we note that this point relied on violates Rule 84.04, in that it challenges two separate and distinct actions of the trial court: first, the contempt portion of the Judgment; and second, the commitment order. Points that present two disparate claims of error are multifarious, do not comply with Rule 84.04, and generally preserve nothing for appellate review. *Martin v. Reed*, 147 S.W.3d 860, 863 (Mo.App.2004). Nevertheless, because this deficiency does not impede disposition on the merit s, this Court will not exercise its discretion to dismiss this point. *Cen-*

*tral America Health Sciences University, Belize Med. College v. Norouzian,* 236 S.W.3d 69, 80 (Mo.App.2007) (citing *Geiersbach v. Blue Cross/Blue Shield of Kansas City,* 58 S.W.3d 636, 639 (Mo.App. 2001)).

■ Turning to the first alleged error, regarding the lack of findings in the Judgment as to Father's current ability to pay, in a motion taken with the case Mother requests that this Court dismiss this point, contending that Father failed to file a motion to amend the Judgment, as required by Rule 78.07(c) and, as such, Father failed to preserve his claim for appeal. A review of the record disclosed that no motion to amend the judgment was filed by Father. Father further failed to file suggestions in opposition to Mother's motion and, although Mother's motion was filed prior to the due date of a reply brief, Father did not file a reply brief to address this issue.

■ Rule 78.07(c) provides: "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." Accordingly, Father here was obligated to put the trial court on notice of an alleged error relating to the form or language of the judgment. *See In re C.K.,* 221 S.W.3d 467, 469 (Mo. App.2007). Rule 78.07(c) was amended effective January 1, 2005. Prior to the amendment, "no post-trial motion was required to preserve an issue for appeal in a court-tried case." *Wilson–Trice v. Trice,* 191 S.W.3d 70, 72–73 (Mo.App.2006). "The amendment was intended to reduce and discourage appeals and subsequent technical reversals for errors in the form of judgments that could easily be corrected by bringing them to the attention of the trial judge." *Id.* Since the amendment of Rule 78.07(c), claims based on a failure to

make required findings are not preserved for appeal and are thereby waived unless raised in the trial court by a motion to amend the judgment. *In re K.R.G.,* 248 S.W.3d 651, 652 (Mo.App.2008); *K.L.A. v. Aldridge,* 241 S.W.3d 458, 462 (Mo.App. 2007); *In re Marriage of Bottorff,* 221 S.W.3d 482, 485 (Mo.App.2007); *In re Holland,* 203 S.W.3d 295, 302 (Mo.App.2006). Therefore, that portion of Father's second point related to the lack of findings in the Judgment, having not been properly preserved for appellate review, is denied. Mother's motion to dismiss is overruled as moot.

### D. Provision for purging in Commitment Order is not vague

The second alleged trial court error in Father's second point is directed toward the Commitment Order wherein Father claims that it does not "give specific instructions about how to purge himself with a payment plan." Father breaks this contention into two parts. First, "[t]he Commitment Order ... is void of the mechanism for [Father] to purge himself of contempt—it only refers to terms given in the Judgment." Second, if the recital of the Judgment purge language in the Commitment Order sufficiently incorporates the Judgment purge mechanism into the Commitment Order, then that "mechanism for the [Father] to purge himself of contempt is too vague to be ascertained."

■ "A civil contempt is not fully adjudged unless the order of commitment contains ... a declaration of the conditions to be met to purge the contempt and so be free of the commitment." *Simmons v. Megerman,* 742 S.W.2d 202, 205 (Mo.App. 1987); *Mischeaux v. Hais,* 939 S.W.2d 49, 50 (Mo.App.1997) (the warrant and commitment order must state what action on

the part of the father would constitute purging).

The first prong of Father's argument may be easily disposed. The Commitment Order recites that:

Now on this 8th day of October, 2008, the Court, having previously, per its Judgment of Modification and Contempt dated August 29, 2008, found [Father] in willful and intentional contempt of this Court's prior judgment by not paying child support and by not paying [Mother] the $21,000.00 awarded to her in the parties' dissolution of marriage and by not paying [Mother's] attorney fees as ordered.

In said Judgment, the Court set forth in its finding of contempt certain terms and conditions by which [Father] might purge himself of said contempt to-wit:

- remitting the $21,000.00, plus interest calculated at the statutory rate from January 7, 1998, until paid to the Howell County Circuit Clerk's office for distribution to [Mother];
- remitting the arrearage amount of $44,128.95 (as of September, 2006) in child support to the Howell County Circuit Clerk's office;
- remitting $1,500 in attorney fees directly to [Mother's] attorney, Steven Privette; and
- remitting $20,000.00 in additional attorney fees directly to [Mother's] attorney, Steven Privette.

[Father] was further given alternate means to purge himself of contempt by either filing a payment plan, approved by [Mother] and [Mother's] attorney with the Court or submitting a plan for repayment of all said amounts which plan was to be approved by this Court.

\* \* \*

WHEREFORE, this Court orders [Father] committed to the Howell County, Missouri Jail until such time as he may comply with the Court's orders previously entered herein and *as recited above.*

(Emphasis added).

The order that Father be committed until such time as Father complies with the Court's orders "as recited above" clearly references the specific purge language contained in the Commitment Order, albeit in the form of a recitation of the purge language contained in the Judgment. The Commitment Order contains a declaration of the conditions to be met to purge the contempt.

The second prong of Father's argument is premised upon his assumption that "the real means for [Father] to purge himself would lie in a specific payment plan." Without citation to any relevant legal authority, Father asserts that "[t]he requirement that [Father] submit a payment plan 'approved by [Mother and Mother's attorney], with the Court, or submit a plan for repayment of all said amount which is approved by this Court' simply is not a specific finding of how [Father] can purge himself." Had the trial court provided these methods as the only means of purging himself of contempt, Father's argument might have some merit. The trial court, however, initially and primarily provided a specific and definite method of purging by the payment in full of the specifically listed sums due and owing. Father does not challenge this method as being vague or indefinite. The mere fact that the trial court indicated its willingness to consider alternate methods of purging by a payment plan initiated by Father does not in any way diminish the specificity or definiteness of the payment-in-full method of purging. Nothing in that method requires the approval of Mother, her attorney, or the Court. As such, "the key to the jail house door," as described in

*Mischeaux,* 939 S.W.2d at 51, is in Father's hand. The remaining portion of Father's second point is denied.

## II. Denial of abatement of child support was not an abuse of discretion

Father's third point challenges the trial court's denial of his request to abate his child support obligations, pursuant to section 452.340.7, which Father contends "allows a court to abate child support when the custodial parent, without justification, failed to provide physical or legal custody to the other parent." Father further asserts that the trial court's denial was against the weight of the evidence because he has not seen the children since 1998, "despite repeated attempts," and he has not received any academic or medical information on the children.

Review on this point is limited to a determination of whether the judgment is supported by substantial evidence, whether it is against the weight of the evidence, or whether it erroneously declares or applies the law. *Forbes v. Forbes,* 133 S.W.3d 508, 510 (Mo.App.2004). "We do not retry the case, rather we accept as true the evidence and reasonable inferences in the light most favorable to the prevailing party and disregard contradictory evidence." *Id.* at 510–11. "We recognize the superior position of the trial court to judge factors such as credibility, sincerity, character of the witnesses, and other intangibles that are not revealed in a trial transcript." *Id.* at 511.

Father argues that "[t]he record shows a consistent effort by [Father] to see his children ... [and] no efforts by [Mother] to require the children to see their father." As support, Father states he "filed a Family Access Motion to see his children at one time[,]" and "sent letters to [Mother] in an attempt to see his kids."

There was testimony at trial that Father filed a Family Access Motion in 2000. Mother testified that she tried to encourage Father to attend the children's t-ball games and contacted Father's father regarding Father attending certain family functions, but Father never came.[4] Mother testified that Father called at times, however those calls were prank calls intended to harass her. Mother further testified that she received only two letters from Father. The first letter provided, *verbatim:*

> Glenwood [school] Officials have informed me that your address is.... Is this where i'm supposed to write to ask to see my boys? I see that living the good life with that fat ass dyke of yours is not turning out to be all that you thought it would be, huh? Because I see where [third-party identifier omitted] finally came to his senses and left her for that little blonde from Sgf.

> As for your punk [third-party identifier omitted], and his [third-party identifier omitted] being a c——sucker, well what else can I say? Children learn from their parents, in this case especially like their mother.

The other letter stated, *verbatim:*

> Do I keep sending my requests to see the Boys to the above address?

> Or do I send it to the dead end road to where you are shacked up with [third-party identifier omitted] and sucking his dick to get to ride around in a new ford expedition?

Father testified that he appeared at the police station to meet Mother to exchange custody "about eight or nine months, con-

---

4. As pointed out in Father's brief, Father's father responded to Mother by telling her that "[Father] could not be in the same room with [Mother] without starting a fight."

secutively[,]" and "gave up after that." Father was initially awarded visitation every third weekend of each month between 6:00 p.m. Fridays until 5:00 p.m. Sundays. Mother testified that in November 1998, when Mother met Father for a custody exchange at the West Plains Police Department, she asked Father to allow the children to walk with their scout troop in a holiday parade that weekend. This angered Father, because it was during his time with them and he did not want to allow it. Father became angry and proceeded to hit the side of Mother's vehicle with his fist, which frightened the children. One of the boys climbed into the front seat and locked the door and would not leave with Father. Police officers there at the station advised Mother that she did not have to make the children go with Father in that situation, and she left with the children. The following month, Mother took the children to the police station to meet Father, and they waited inside for him. When Father arrived, he was very abrupt with her and told the children, "Let's go." However, when the children began crying, Father became angry and walked out the door and left without them. Mother returned for the custody exchange in January, but Father did not appear, and she returned home with the children. For several months afterward, Mother took the children to the police station at the appointed time and waited until approximately 6:10 p.m., at which time she left because Father had not arrived.

Section 452.340.7 provides, in part:

A court with jurisdiction may abate, in whole or in part, any past or future obligation of support and may transfer the physical and legal or physical or legal custody of one or more children if it finds that a parent has, without good cause, failed to provide visitation or physical and legal or physical or legal custody to the other parent pursuant to the terms of a judgment of dissolution, legal separation or modifications thereof.

■ Father concludes that the trial court's denial of abatement pursuant to this statute "was against the weight of the evidence and an abuse of discretion," primarily relying upon the fact that Father had not had any visitation since 1998 and his testimony as to why he had not had such visitation. The record, however, viewed in the light most favorable to the Judgment, shows that Mother did not fail to provide visitation, and that if she failed to provide visitation, it was not without good cause. Conflicting testimony on these issues was presented at trial, and resolution of those conflicts rested within the trial court's discretion to determine the credibility of the witnesses. *Walters,* 181 S.W.3d at 138 (citing *Love v. Love,* 75 S.W.3d 747, 754 (Mo.App.2002), for the proposition that in considering the weight of the evidence, "[w]hen conflicting evidence exists, the trial court has the discretion to determine the credibility of witnesses"). Apparently, the trial court assigned little weight or credibility to Father's testimony regarding the incidents related to visitation and believed Mother's testimony.

■ Notwithstanding the trial court's discretion to determine witness credibility, it has the discretion whether or not to abate child support even if a parent has, without good cause, failed to provide visitation. The use of the term "may" in section 452.340.7, "implies alternate possibilities and that the conferee of the power has discretion in the exercise of the power." *See State ex rel. Nixon v. Boone,* 927 S.W.2d 892, 897 (Mo.App.1996). "[T]the primary purpose of child support is to provide for the child's welfare." *Gerlach v. Adair,* 211 S.W.3d 663, 669 (Mo.App. 2007). The trial court could have reason-

ably concluded that it would have been counterproductive to this purpose to reward Father's long-standing contemptuous behavior in failing to pay child support by exercising its discretion to abate that child support due to visitation-related problems. Other than the bald assertion that the trial court abused its discretion, Father has not put forward any rationale for concluding that the trial court abused its discretion as granted under this statute. In the absence of such a rationale supported by the facts, Father has failed to convince this Court that the trial court abused its discretion in failing to abate his child support. Point three is denied.

### Decision

The Judgment and Commitment Order are affirmed.

BURRELL, P.J., and PARRISH, J., concur.