June DELANY et al., Plaintiffs-Appellants,

v.

ST. LOUIS UNION TRUST COMPANY, a corporation, et al., Defendants-Respondents.

No. 35245.

Missouri Court of Appeals, St. Louis District, Division Three.

Dec. 23, 1974.

Motion for Rehearing or Transfer Denied Jan. 14, 1975.

Application to Transfer Denied March 10, 1975.

Gray & Stewart, E. Thomas Clarkin, Clayton, for plaintiffs-appellants.

Bryan, Cave, McPheeters & McRoberts, St. Louis, for St. Louis Union Trust Co.

Willson, Cunningham & McClellan, St. Louis, for individual defendants and respondents.

GUNN, Judge.

This appeal concerns a class action for declaratory judgment seeking construction of a profit sharing plan and trust created by Dempsey-Tegeler & Co., Inc.,[1] a stock brokerage house, for the benefit of its employees. Plaintiffs-appellants, as members of a class, appeal from the judgment of the trial court sitting in equity which decreed that employees in defendant-respondents' class were entitled to 100 percent vesting of the contributions to the Plan made by the Company on their behalf; that employees in plaintiffs' class, whose employment with the Company ended prior to June 1, 1970, were vested with only 10 percent of their accounts contributed to by the Company with 90 percent of the non-vested balances of the accounts being forfeited and ordered distributed pro rata to employees in defendants' class. As part of its decree, the trial court indited findings of fact which best elucidate the relevant particulars of the case and require little emendation. The findings of fact upon which the trial court based its judgment are here repeated:

"1. This is a class action for the construction of a profit-sharing plan and trust created by Dempsey-Tegeler & Co., Inc. on November 1, 1966, for the benefit of employees of the Company. The Plan was amended four times before it was terminated on February 1, 1971. The Company made contributions to the trust under the Plan but was placed in liquidation in August, 1970. As of June 1, 1970, a date whose significance will hereinafter appear, the Trustee (St. Louis Union Trust Company) had on hand about $600,000 in securities. The core issue is the proper distribution of about $156,000 of the trust funds representing so-called 'forfeitures' which occurred by reason of the termination of employment of various persons, including plaintiffs, at various times and for various reasons between October 31, 1969 and June 1, 1970.

"2. The Company began to experience many operational and financial difficulties as early as 1968. Its problems were complicated by violations of the rules of the New York Stock Exchange, resulting in a fine of the Company and the suspension by the Exchange of Jerome F. Tegeler, the Company's president and founder, on October 26, 1969. The Company made no contribution to the Plan at the end of the Plan Year, October 31, 1969. That date—October 31, 1969—is a critical one under the contentions of the plaintiffs.

"Heroic efforts were undertaken under conditions imposed by the Exchange to increase the internal efficiency and capital of the Company. For a combination of many reasons, some of them antedating October 31, 1969, and some of them unforeseeable on October 31, 1969, and supervening after that date, attempts at reconstruction and rehabilitation of the Company failed. It was dealt a staggering blow by the precipitous decline in security values which engulfed the entire nation in 1969 and 1970. A good example of the effect of that 'recession' is the severe reduction in values of securities held in the Trust under the Plan between October 31, 1969, and June 1, 1970.

1. The profit-sharing plan will be referred to as "the Plan," and Dempsey-Tegeler & Co., Inc. will be referred to as the "Company."

"There was a natural loss of employees of the Company both before and after October 31, 1969, some of whom quit voluntarily and some of whom were discharged in the execution of efforts of the Company to reduce its overhead. But the salaried employees who remained did not relinquish their efforts to save the floundering ship. The crippled company remained afloat even though its maneuvers were drastically curtailed. It was not until June 4, 1970, that an event occurred, opened the sea valves and scuttled the vessel.

"On June 4, 1970, a meeting of the Board of Directors of the Company took place in New York City. Representatives of the New York Stock Exchange were present. According to the minutes of that meeting 'the Board signed an undated Liquidation Agreement with the Stock Exchange' upon an assurance that a change would be made in the corporate charter giving the Board the power to execute the Agreement.

"The minutes of that meeting also disclose the following: Mr. Coleman moved that counsel for the Board be instructed to amend the Dempsey-Tegeler & Co., Inc. Profit-Sharing Plan to make all employees fully vested as of June 1, 1970, as provided by the Plan. The motion was seconded by Mr. Gittins and passed unanimously.

"Sometime in July, 1970, attorneys for the Company drafted the Fourth Amendment to the Plan, and it was duly signed and attested. It amended Article VII of the Plan by adding at the end thereof the following paragraph; Notwithstanding anything to the contrary above stated, the then balance in each Participant's Company Contribution Account shall be fully vested as of June 1, 1970.

"4. On August 7, 1970, a liquidator was appointed for the Company and it was placed in liquidation. On February 1, 1971, the Board of Directors of the Company terminated the Plan.

"5. On or shortly before April 21, 1971, the Profit-Sharing Committee established by the Plan made a determination that 'the date of termination shall be construed to be the last day worked.'

"6. The firm of Gray, Stewart & Fletcher, attorneys, has represented all of the plaintiffs and has performed valuable services in aid of a necessary construction of the trust. Their clients are all of those employees of the Company whose last day of work for it fell on some date between October 31, 1969, and June 1, 1970, and who were terminated for some reason other than death or permanent and total disability. Some of them quit voluntarily; others were discharged for reasons not shown in evidence. The whole class consists of about 126 persons of whom 15 had accrued vacation time and received pay for periods extending through or beyond June 1, 1970. The individual defendants represent a class consisting of those 230 persons whose last day of employment was after May 31, 1970. The corporate trustee is also a party defendant but its position is that of a neutral stakeholder."

The dispute between plaintiffs and defendants centers on the interpretation to be given to the Fourth Amendment to the Plan adopted unanimously by the Company Board of Directors on June 4, 1970, providing:

"Notwithstanding anything to the contrary above stated, the then balance in each Participant's Company Contribution Account shall be fully vested as of June 1, 1970."

■ "Participant" as defined in the Plan was "any salaried employee," with certain limitations not here pertinent. On October 31, of each year, which was the close of the Plan year and the Company's fiscal year, the Company was to contribute a percentage of net profits to the Plan trust to be allocated to each participant's account in a prescribed ratio. The per-

centage of the account vested in the participants was determined according to the number of years the participant had been employed with the Company, with the non-vested portion being forfeited "upon termination of employment for any reason other than retirement, death or permanent and total disability." According to the Plan the forfeited amounts would be reallocated among the accounts of the other participants. We emphasize that under the terms of the Plan, the Company had the right to amend the Plan in whole or in part, the only limitations on this power being that no amendment would authorize trust funds for purposes other than for the benefit of the participants; neither could an amendment reduce the amount previously credited to a participant's account nor cause any trust funds to revert to the Company. The Plan also gave the Company the right to terminate the Plan and "upon permanent discontinuance of the Company's contribution or distribution or termination of the Plan, each participant's Company contribution account . . . shall become fully vested, and shall not thereafter be subject to forfeiture."[2] We also observe that there was no challenge to the capacity or authority of the Board of Directors to create the Plan or make amendment thereto, and, indeed, the control and management of a corporation's business and properties, including a legiti-

mate pension plan, are to be exercised by the Board of Directors. § 351.310 RSMo 1969, V.A.M.S.; Saigh v. Busch, 396 S. W.2d 9 (Mo.App.1965), cert. denied, 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 541 (1966).

The Company made its contribution each October 31, with the one exception noted in the trial court's findings of facts—at the close of 1969 fiscal year, the Company suffered a loss and since there were no profits, no contribution was made.

Through various financial and operational maneuverings, the Company, though enervated, continued operations from October 31, 1969, and in March, 1970 the New York Stock Exchange even lifted restrictions it had placed on the Company. But on June 4, 1970, due to worsened conditions, the New York Stock Exchange required the Company to sign the undated liquidation agreement to be implemented at a later date by the Stock Exchange at its discretion and which was in fact implemented on October 7, 1970. Faced with the possibility of liquidation and the knowledge that the corporate existence was withering and scarcely sanguineous, on June 4, 1970 the Board of Directors unanimously adopted the Fourth Amendment to the Plan calling for its being vested for participants as of June 1, 1970. The effect of the Fourth Amendment, as construed by

2. "1. *Amendment.* The Company shall have the right at any time and from time to time to amend, in whole or in part, any or all of the provisions of the Plan. No such amendment, however, shall authorize or permit any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their beneficiaries or estates; no such amendment shall cause any reduction in the amount theretofore credited to any Participant's account or cause or permit any portion of the Trust Fund to revert to or become the property of the Company.

\* \* \* \* \*

2. *Termination; Discontinuance of Contributions.* The Company shall have the right at any time to discontinue its con-

tributions hereunder and to terminate this Plan. Upon permanent discontinuance of the Company's contributions or termination of the Plan, each Participant's Company Contribution Account and Participant's Contribution Account shall become fully vested, and shall not thereafter be subject to forfeiture. Upon termination of the Plan or upon complete discontinuance of contributions, the Committee shall direct the Trustee to distribute, over such period of time (not exceeding 3 years) as the Committee may deem to be in the best interests of the Participants or their beneficiaries, all assets remaining in the Trust, after payment of any expenses properly chargeable against the Trust, to the Participants, in accordance with the value of each Participant's accounts as of the date of such termination, in cash or in kind.

the trial court, was to fully vest the accounts in the names of the employees who were still employed by the Company as of June 1, 1970 and to cause a forfeiture of 90 percent of the accounts in the names of former employees who had left the Company, whether voluntarily or involuntarily, prior to June 1, 1970.

Plaintiff-appellants, who brought this class action for declaratory judgment, represent those employees of the Company whose employment had been terminated prior to June 1, 1970. On appeal, plaintiffs' attack on the trial court's judgment is fourfold. They assert: 1) that the Fourth Amendment to the Plan should be construed to include employees who were terminated prior to June 1, 1970; or 2) that the Plan terminated by operation of law on October 31, 1969 by virtue of the impossibility of the Plan's purpose being fulfilled due to the Company's precarious financial status; or 3) since no contributions were made to the Plan by the Company on October 31, 1969, there was a permanent discontinuance of contributions within the meaning of the Plan as of October 31, 1969, and, therefore, the Plan terminated as of that date; or 4) that the power to amend vested by the Plan in the Board of Directors was not exercisable in connection with the Company's going out of business, and, therefore, a court of equity would be free to order an equitable distribution, which according to plaintiffs, would include them.

■ Before consideration of the issues, we recite certain basic legal aphorisms. On appeal from a judgment rendered in a court-tried case we review both the law and the facts. However, we are governed by the tenet that we do not set aside the judgment unless it is clearly erroneous. In re Counts, 511 S.W.2d 923 (Mo. App.1974); Lucas v. Beco Homes, Inc., 494 S.W.2d 417 (Mo.App.1973); Rule 73.-01(d). Plaintiffs urge, and we agree, that where the majority of the evidence is in writings and documents, the deference given to the trial court is not the same as where the evidence consists of oral testi-

mony. Prior v. Hager, 440 S.W.2d 167 (Mo.App.1969). While there was a great volume of documentary evidence in the case, there was much oral testimony presented at trial by both parties and relied on by the trial court in rendering its judgment. Rule 73.01(d) directs the appellate court to give due regard to the trial court's opportunity to judge the credibility of the witnesses and not to set aside the judgment unless clearly erroneous. Since we find that the trial court's judgment is not clearly erroneous, we affirm the decision.

■ We now consider the issues. Plaintiffs first assert that they should be included in the vesting decreed by the Fourth Amendment to the Plan and in so arguing place emphasis on one phrase of the Fourth Amendment—"the then balance." Plaintiffs argue that since no contributions, allocations or forfeitures are determined until the close of the fiscal year, each October 31, their balances still existed as of June 1, 1970. Plaintiffs, however, have disregarded the end of the very phrase they rely on: "the then balance in each *Participant's* Company Contribution Account." [emphasis added.] On June 1, 1970, none of the plaintiffs was an employee and therefore none could be a participant. Further, the trial court construed the Plan to mean that the date of the forfeiture resulting from termination of employment was the date of the termination with only the allocation of the forfeitures to the accounts of the other participants being made at the end of each fiscal year. The amendment fully vesting accounts as of June 1 did not have the effect of divesting plaintiffs of their accounts; their accounts had already been forfeited when their employment terminated.

■ Plaintiffs' contention that the Plan terminated by operation of law on October 31, 1969 by virtue of impossibility of fulfilling the Plan's purpose is also without merit. The evidence shows, and the trial court so found, that as of October 31, 1969, the Company was an on-going business. There were no plans to liquidate the company at that time; in fact, the Company

was taking steps, albeit transitory, to reduce its losses so as to be able to continue in operation. It cannot be said that as of October 31, 1969, the Plan's purpose to share the Company's profits with its employees, to promote efficiency and to provide funds for the employees' retirements were not able to be carried out or that the corporate demise was ineluctable. We cannot say the trial court's findings, consonant with the foregoing, were clearly erroneous.

Plaintiffs next assert that there was a permanent discontinuance within the meaning of the Plan as of October 31, 1969, since the Company made no contribution to the Plan at the close of that fiscal year, which operated to terminate the Plan and vest the accounts of all the employees. The trial court construed the phrase "permanent discontinuance of the Company's contributions" to require either a voluntary act on the part of the Company, or an involuntary act, such as liquidation. This construction cannot be said to be clearly erroneous and, therefore, we will not disturb the trial court's ruling in this regard.

Plaintiffs' last contention is that the amendment power was not exercisable in connection with going out of business and they urge that an equitable distribution be ordered. The trial court considered this assertion. It held that the Company's power to amend the Plan included the power to adopt this amendment. The Company had broad powers to amend the Plan and none of the restrictions placed on the amendment power was violated here. There was no diversion of trust funds to uses other than for the benefit of the participants; there was no reversion of any trust property to the Company. The only effect of the amendment was to accelerate vesting. The trial court also found that any date selected by the Board of Directors as the date of full vesting would be subject to the same charges of arbitrariness and inequity. As there had been no proof of fraud or illegality in setting June 1, 1970 as the date of vesting, the trial court sustained the Board's action. Plaintiffs have failed to

establish that this construction is erroneous, and we affirm the construction given by the trial court.

Plaintiffs have also asserted that certain evidence excluded by the trial court should have been admitted. In this regard, the following statement of the court in Adams v. Foster, 466 S.W.2d 706 (Mo.1971), l. c. 710, is particularly appropriate and felicitous:

"In this review it is not necessary to discuss the arguments and authorities advanced in support. All of . . . [appellants'] evidence has been stated and considered without regard for the accuracy of any such exclusions or refusals because when reviewed in its entirety, the evidence does not dictate conclusions contrary to those of the trial court."

The judgment is affirmed.

SIMEONE, P. J., and McMILLIAN, J., concur.