

# Missouri Court of Appeals

## Southern District

### Division Two

In Re the Marriage of:  )
SCOTT D. YONKER, and  )
VALERIE K. YONKER,  )
  )
SCOTT DAMIAN YONKER,  )
  )
    Petitioner-Respondent,  )
  )
vs.  )    No. SD32564
  )
VALERIE KAY YONKER,  )    **Filed: March 4, 2014**
n/k/a VALERIE KAY BOYCE,  )
  )
    Respondent-Appellant.  )

APPEAL FROM THE CIRCUIT COURT OF BARRY COUNTY

Honorable Robert J. Foulke, Associate Circuit Judge

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS**

Valerie Kay Yonker (now Boyce) ("Ex-Wife") appeals the judgment of contempt and subsequent order of commitment entered after she failed to pay her ex-husband, Scott Damian Yonker ("Ex-Husband"), $250,000.00 as required by the parties' dissolution judgment.

Ex-Wife's first point claims the trial court's contempt finding "was an abuse of discretion, against the weight of the evidence and not supported by substantial evidence in

that [Ex-Wife] did not have the financial ability to pay said debt to [Ex-Husband.]"  Her second point challenges the trial court's order of commitment (ordering Ex-Wife's incarceration) on the grounds that it "was an abuse of discretion, not supported by substantial evidence and was against the weight of the evidence and misapplied or misdeclared [sic] law" because Ex-Wife lacked "the present ability to pay $200,000 or $250,000 to [Ex-Husband] either at the time of trial, the entry of the judgment of contempt or the order of commitment, or on May 1, 2013[.]"

Finding merit only in Ex-Wife's second point, we affirm the contempt judgment but reverse and vacate the order of commitment and remand the matter for further proceedings on the propriety of Ex-Wife's incarceration because no substantial evidence of Wife's present ability to purge herself of contempt was before the trial court at the time it entered its January 2013 commitment order.

### Applicable Principles of Review and Governing Law

"A trial court's judgment in a civil contempt proceeding must be affirmed unless there is no substantial evidence to support the judgment, the judgment is against the weight of the evidence,[1] or it erroneously applies or declares the law." *Stuart v. Ford*, 292 S.W.3d 508, 514 (Mo. App. S.D. 2009).  The ruling will not be disturbed "absent a clear abuse of discretion." *Id.* at 513.

---

[1] A claim that a judgment is against the weight of the evidence "presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact." *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010).  Ultimately, the challenger must "demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition." *Id.* at 187.  Because Ex-Wife's brief makes no attempt to present the type of argument required by an against-the-weight-of-the-evidence challenge, she has abandoned that ground of alleged error and we will review only her claims that the judgments were not supported by substantial evidence or misstated or misapplied the law. *See Weisenburger v. City of St. Joseph*, 51 S.W.3d 119, 124 (Mo. App. W.D. 2001) (arguments raised in point but not developed in argument section "of the brief are deemed abandoned and present nothing for appellate review").

Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Anglim v. Missouri Pac. R.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992).

The parties disagree about the proper measure of deference this court owes the trial court on its resolution of disputed facts. Although Ex-Wife admits that we must defer to the trial court on all matters involving the credibility of witnesses, she claims that we do not owe the same deference when it comes to "documentary evidence[,]" citing *South Side Plumbing Co. v. Tigges*, 525 S.W.2d 583, 589-90 (Mo. App. St.L.D. 1975),[2] and *Earls v. Majestic Pointe, Ltd.*, 949 S.W.2d 239, 246 n.9 (Mo. App. S.D. 1997). Based on these cases, Ex-Wife -- who relied heavily on certain documentary evidence she presented to the trial court -- claims that our review of such evidence is *de novo*.

The *Earls* court was "mindful that the trial court can believe all, part, or none of the testimony of any witness." 949 S.W.2d at 246. In a footnote to that statement, it added,

---

[2] The cited passage in *South Side Plumbing Co.* reads:

> We review this court-tried case on both the law and the evidence in the record, de novo. The Court of Appeals makes its own independent findings of fact but will not set aside a judgment unless it is clearly erroneous, having given due regard to the trial judge's advantage in determining the credibility of witnesses and deferring to the trial court's findings on conflicting evidence. *Menos v. Hodges*, 499 S.W.2d 427 (Mo.1973); *R.L.S. v. J.E.S.*, 522 S.W.2d 5 (Mo.App.1975); *Johnson County Post No. 2513, V.F.W., Inc. v. Jackson*, 519 S.W.2d 335 (Mo.App.1975). In making its de novo review, the reviewing court will consider that evidence it deems admissible and will exclude from consideration improperly admitted evidence. *Menos v. Hodges*, *supra*; *Martin v. Norton*, 497 S.W.2d 164 (Mo.1973). Having excluded from our review all improperly admitted parol evidence, we find that there is no conflict in the record. Where, as here, the only admissible evidence was documentary, the issue of witness credibility does not arise. *In re Estate of Wintermann*, 492 S.W.2d 763 (Mo.1973); *Delany v. St. Louis Union Trust Co.*, 518 S.W.2d 704 (Mo.App.1974). We only determine the legal effect of the documentary evidence—the construction and disbursing escrow agreement—which, being a matter of law, is reviewable by the Court of Appeals.

525 S.W.2d 589-90.

3

"While this Court gives deference to the trial court's credibility determinations on witnesses, the documentary evidence in this case is not subject to the deference rule[,]" *id.* at n.9, citing *Hinkle v. Emmons*, 826 S.W.2d 359, 361 (Mo. App. E.D. 1992). *Hinkle* makes a similar statement: "Most of the evidence in this case was documentary and is not subject to the deference rule." *Id.*

It is important to note that each of the aforementioned opinions predate our supreme court's statement in *Business Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999), that "this Court defers to the trial court as the finder of fact in determinations as to whether there is substantial evidence to support the judgment and whether that judgment is against the weight of the evidence, even where those facts are derived from pleadings, stipulations, exhibits and depositions."[3] Appellant's argument is also inconsistent with our high court's more recent, watershed opinion of *White v. Director of Revenue*, 321 S.W.3d 298 (Mo. banc 2010), which held that

> [w]hen the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence. *Bakelite Co. v. Miller*, 372 S.W.2d 867, 871 (Mo. 1963). If the trier of fact does not believe the evidence of the party bearing the burden, it properly can find for the other party.

*Id.* at 305.

As a result, we must reject Ex-Wife's position and persist in our more recently expressed standard: "When determining sufficiency of evidence pursuant to the *Murphy v.*

---

[3] To the extent that this court's subsequent statement in *Kimberling N., Inc. v. Pope*, 100 S.W.3d 863, 871 (Mo. App. S.D. 2003) -- that "[w]hile we give due regard to the ability of the trial court to judge the credibility of witnesses, this rule of deference does not apply where, as is often the case here, the facts derive from written documents or exhibits" -- suggests otherwise, it should not be followed. A possibly consistent, narrow reading of *Kimberling N.* and the opinions cited by Ex-Wife is that the appellate court reviews *de novo* only what the document at issue -- on its face -- actually states or depicts. However, such a narrow interpretation is not what is being suggested here. Ex-Wife's assertion is that this court must always view documentary evidence as more credible and weighty than oral testimony when the two are in conflict.

4

*Carron* standard, appellate courts accept as true the evidence and inferences favorable to the trial court's judgment, disregarding *all* contrary evidence." **Jarrell v. Director of Revenue**, 41 S.W.3d 42, 46 (Mo. App. S.D. 2001) (emphasis added). Our following summary of the relevant facts is in accord with that standard.

**Facts and Procedural Background**

*The Dissolution Judgment*

The parties were divorced on February 3, 2009 after reaching "a settlement as to all issues." Ex-Wife was represented by counsel at the dissolution hearing and during the subsequent contempt proceedings. The dissolution judgment approved the "Marital Settlement and Separation Agreement" ("marital agreement"), and it divided the parties' property "as set forth on Exhibits A - F attached to the [marital agreement]." Exhibit B ("[Ex-Husband]'s Share of Marital Property") and Exhibit E ("[Ex-Wife]'s Debts") together provided that Ex-Wife would make two cash payments to Ex-Husband. One cash payment, in the amount of $300,000, was to be made when the trial court signed the dissolution judgment ("the first payment"), and it was made as ordered. "An additional cash payment from [Ex-Wife] in the sum of $250,000 [was to be made] within two (2) years of " the dissolution judgment and there was "a promissory note by [Ex-Wife] in favor of [Ex-Husband] acknowledging that such obligation shall bear interest at the rate of 6% per year." Ex-Husband filed "**PETITIONER'S MOTION FOR CONTEMPT**" on January 9, 2012. On January 13, 2012, the trial court set a show-cause hearing for April 20, 2012.

Ex-Wife admitted in her "answer" to Ex-Husband's motion "that she ha[d] not paid the additional cash payment in the amount of $250,000 [("the second payment")] and that two years ha[d] elapsed since the entry of the [dissolution judgment[.]" Ex-Wife also

5

maintained in her answer that "she [wa]s financially unable to fully comply with the [dissolution judgment]." At the beginning of the show-cause hearing in April 2012, the trial court took "judicial notice of all its files" related to the parties' dissolution.

*The Contempt Hearing*

Ex-Husband testified that he agreed to allow Ex-Wife to make two equalization payments under the dissolution decree because most of their assets were "in real estate" and there was a loan against some apartments that Ex-Wife wanted to keep. Ex-Husband testified that he "had to wait until they [sic] got another loan for that money to be released so [he] could get the rest of [his] money."

Ex-Wife made the first payment to Ex-Husband by paying $240,000 from one bank account, leaving her with approximately $135,000 in that bank, and paying $60,000 from a second account, leaving her approximately $65,000-$70,000 in that bank. Ex-Wife also had $114,800 at a third bank and $18,000 in currency. Thus, Ex-Wife had at least $632,800 in cash at the time of the dissolution. Her initial $300,000 payment to Ex-Husband then left her with approximately $332,800 in cash.

Ex-Wife eventually used the remaining money from the first bank to pay down a loan on vacant land held by one of Ex-Wife's business interests, the nature of which will be discussed, *infra*. As for the money in the second bank, Ex-Wife testified that she spent $59,000 of it shortly after the divorce to make a down payment on a house with 14 acres of land. She testified that she spent the remainder on living expenses. Ex-Wife testified that she also spent the money in the third bank after March 2010 on "monthly bills[.]"

In addition to cash, Ex-Wife received the couple's 25% interest in Kensington Park Apartments, LLC ("Kensington Park Apartments"). Ex-Wife's two brothers owned the

6

remaining interest, split at 25% and 50%. The value of Ex-Wife's equity in Kensington Park Apartments was valued by the parties at the time of the divorce at $650,000.

Ex-Wife admitted that her tax returns showed that Kensington Park Apartments had distributed approximately $104,000 to her in 2009. Ex-Wife testified that by March 2010, Kensington Park Apartments had split into two companies, Kensington Park Apartment Homes, LLC[4] ("Kensington Park Apartment Homes") which owned "the apartment complex" and Kensington Park Investments, LLC ("Kensington Park Investments") which "owns the vacant land next to the apartments[.]" The ownership percentages between Ex-Wife and her brothers remained the same when the new companies were created. At the time of the divorce, $67,200 was held as collateral by Ex-Wife's first bank for a loan on the vacant land. A new loan was obtained for the land now held by Kensington Park Investments after the divorce, and Ex-Wife pledged $140,502.76 in one of her bank accounts as security for the loan. Ex-Wife then paid the amount that she pledged toward this loan while her brothers, collectively, made a $52,000 payment toward the loan balance.

Tax return information from Ex-Husband's Exhibit 13 showed that Ex-Wife received $30,750 in distributions from Kensington Park Apartment Homes in 2010. Ex-Wife admitted that she received "$8,553 in ordinary business income" and "distributions of $10,310" from Kensington Park Investments in 2010. Tax return information from Ex-Husband's Exhibit 29 showed that Ex-Wife received $59,350 in distributions from Kensington Park Apartment Homes in 2011. Ex-Husband's Exhibit 14, also consisting of tax return information, was admitted into evidence and it showed that Ex-Wife received

---

[4] Ex-Husband's Exhibit 13, a 2010 tax return admitted into evidence, shows the name of the company as "Kensington Park Apartments & Homes LLC." The ampersand symbol does not appear on the 2011 tax return admitted into evidence as Ex-Husband's Exhibit 29.

7

$15,404.37 in income and $16,475 in distributions from Kensington Park Investments in 2011.

Ex-Wife was awarded four rental houses in the dissolution judgment. She testified that only one of the four houses "ha[d] any equity in it[,]" and she estimated that equity at approximately $10-15,000. Ex-Wife admitted that she bought another house after the divorce and then sold it in June 2010. Although the sale netted her $18,000, she did not pay any of it toward the amount she owed Ex-Husband. Ex-Wife had a realty business, Boyce Homes, and she had a valid realtor's license.

Ex-Husband made a demand for the second payment through his attorney in January 2011. Ex-Wife's counsel informed Ex-Husband that Ex-Wife "didn't have the money to pay it[,]" and Ex-Husband did not receive the second payment when it became due on February 3, 2011.

In July 2011, Ex-Wife paid approximately $41,000 to invest in an "Orange Leaf Yogurt shop" that her brothers had also invested in. She had not received any distributions as a result of this investment. In October or November 2011, Ex-Wife traded the 2007 Cadillac Escalade she was awarded in the divorce for a 2010 Cadillac Escalade which cost approximately $62,778. Although she received $10,000 back from the dealer on the exchange, she did not pay any portion of it to Ex-Husband. Instead, she used the money to pay "bills[.]" Ex-Wife stated in her loan application for the vehicle that she "earn[ed] $100,000 a year." She also signed a credit application in connection with the vehicle purchase that stated her "gross income [at] $250,000 a year[.]"

"[A]round November of 2011," Ex-Husband filed "garnishments [and] charging orders" in an attempt to collect the second payment, but the garnishments and charging

8

orders did not produce any money. The legal file also reflects that Ex-Husband filed a "Notice to Appear for Judgment Debtor Examination[,]" but Ex-Wife did not appear. A docket entry reflects that the "Summons [was] Returned Non-Est" and that "Occupant would not open door[.]" Ex-Husband testified that he incurred attorney fees totaling $21,066.82, including time in preparation for the contempt hearing, and a "Statement of Attorney's Fees" was admitted into evidence as Ex-Husband's Exhibit 28.

In March 2012 -- approximately six weeks before the contempt hearing -- Ex-Wife sold all but one percent of her interest in Kensington Park Apartment Homes to her brothers for $45,000. She also sold all but one percent of her interest in Kensington Park Investments to her brothers for $20,000. The sale terms allowed Ex-Wife's brothers to pay for their purchases of her shares by promissory notes that spread their monthly payments over twenty years. Ex-Wife also paid $4,000 in legal fees related to the transactions.

After hearing the evidence, the trial court gave the parties until May 4, 2012 to file briefs and proposed judgments. On May 3, 2012, Ex-Wife filed a notice of bankruptcy, and the trial court entered an order the next day staying "[a]ll matters in this cause[.]" In October 2012, notice of an "ORDER STAYING CHAPTER 13 PROCEEDINGS PENDING RESOLUTION OF STATE COURT CONTEMPT PROCEEDING" was filed in the instant case. The parties filed briefs, and the trial court entered a "**JUDGMENT OF CONTEMPT**" ("contempt judgment") on October 19, 2012.

The contempt judgment found that Ex-Wife "has had, and continues to have the ability to comply with the [dissolution j]udgment and has failed and refused to do so and/or [she] has willfully and contumaciously placed herself in a position of inability to pay the [dissolution j]udgment and or [Ex-Wife] has willfully and contumaciously placed herself in

9

a position of inability to pay the [dissolution j]udgment herein[.]" As a result, the trial court found Ex-Wife in contempt and ordered her incarceration. However, the contempt judgment stayed its order of incarceration upon Ex-Wife's "compliance with the Purge Order" contained in the contempt judgment. The Purge Order required Ex-Wife to pay Ex-Husband $250,000 within 60 days. The contempt judgment also ordered Ex-Wife to pay interest on the overdue second payment, along with Ex-Husband's attorney fees, but payment of those particular sums was not required in order to purge her contempt. Additional findings from the contempt judgment will be addressed in the context of our analysis of Ex-Wife's error claims.

On January 18, 2013, Ex-Husband filed a "**NOTICE OF ENTRY OF ORDER GRANTING MOTION TO DISMISS AND REMOVING FROM HEARING DOCKET**" that related to Ex-Wife's bankruptcy petition. The attached order from the bankruptcy court, incorporated into the notice, gave "collateral estoppel effect" to the trial court's findings in the contempt judgment and concluded that Wife's filing of the bankruptcy case "constitute[d] bad faith warranting dismissal of the case for cause[.]"

On January 22, 2013, the trial court entered an "**ORDER OF COMMITMENT**" ("the commitment judgment"). The commitment judgment found that Ex-Wife's "failure and refusal to comply with the Court's [dissolution j]udgment is intentional and contemptuous; and [Ex-Wife] has had and continues to have the ability to comply with the [dissolution j]udgment and has failed and refused to do so and/or [Ex-Wife] has willfully and contumaciously placed herself in a position of inability to pay the [dissolution j]udgment." The commitment judgment further found that Ex-Wife "has not complied with the Purge Order . . . and in fact, has failed to pay any of the sum owed to [Ex-Husband]."

10

The commitment judgment amended the purge order so that Ex-Wife was to pay to the circuit clerk $50,000 in cash by January 31, 2013 at 4:00 p.m. and $200,000 by May 1, 2013 at 1:00 p.m. Ex-Wife's "immediate attachment and commitment" to jail was ordered if either deadline was missed.

A hearing was held on January 31, 2013, and the trial court entered an order finding that Ex-Wife "does not purge the [commitment judgment]" and ordering that Ex-Wife "have bail on the [commitment judgment] in the amount of fifty thousand dollars ($50,000.00) cash, cashiers check or money order."[5] Later that same day, Ex-Wife filed her notice of appeal as to both the October 19, 2012 contempt judgment and the January 22, 2013 commitment judgment.[6]

**Analysis**

*Point I – Contempt*

"A party alleging contempt establishes a prima facie case for civil contempt when the party proves: (1) the contemnor's obligation to perform an action as required by the decree; and (2) the contemnor's failure to meet the obligation." ***Walters v. Walters***, 181 S.W.3d 135, 138 (Mo. App. W.D. 2005). Here, Ex-Wife "concedes that [Ex-Husband] established a prima facie case of contempt against her in that he demonstrated that [Ex-Wife] failed to pay him the [second payment] by February 3, 2011, as required by the divorce judgment." "Once a prima facie case of contempt is established, the alleged contemnor bears the burden of proving that he is financially unable to pay and that the

---

[5] "The posting of a property bond pending appeal confers jurisdiction upon this Court in that the trial court's judgment of contempt has been executed." ***Cheatham v. Cheatham***, 101 S.W.3d 305, 308 n.1 (Mo. App. E.D. 2003). Although the trial court used the term "bail[,]" we presume that the "bail" was intended to act as a bond pending appeal. *See* Rule 81.09(a)(2) and (b). All rule references are to Missouri Court Rules (2013).
[6] Docket entries made a part of the legal file show that on February 1, 2013, Ex-Wife was permitted to postpone her ordered incarceration by posting cash bonds totaling $50,000.

11

inability to pay is not the consequence of his own intentional and contumacious conduct."

***Lyons v. Sloop***, 40 S.W.3d 1, 11 (Mo. App. W.D. 2001). The burden of proof falls on the alleged contemnor at this point in the proceedings because he has better access to the facts to show that he should not be found in contempt. ***Id.***[7]

Ex-Wife argues that "the trial court's finding that [she] had the ability to pay the debt was against the weight of the evidence and not supported by substantial evidence." The trial court found in the contempt judgment, *inter alia*, that after Ex-Wife paid Ex-Husband the first payment, she was left with "over $333,000.00 in cash in February, 2009[.]" It further found that even after making the $59,000 down-payment on a house, Ex-Wife was left with "over $274,000.00 cash[.]" Noting that Ex-Wife "testified that she paid $140,000.00 of this toward the debt on 7 acres of land owned by [Kensington Park Investments] and has spent the remainder of $134,000.00 on unspecified 'living expenses[,]'" the trial court found that Ex-Wife "ha[d] not credibly shown that she had to expend $274,000.00 in cash in less than two years (February 2009 to February 2011) *in addition* to her income that she receives through her investments and business operations."

The trial court also specifically found that Ex-Wife "transferred her business interests to avoid the collection of debt." It found that Ex-Wife's business interests were valued at $650,000 at the outset, and had produced "lucrative" distributions in 2009, 2010, and 2011. In contrast, after the contempt motion was filed and scheduled for a hearing, Ex-Wife "and her partners conspired to transfer [Ex-Wife's] ownership interest in the [companies] to her brothers to avoid [Ex-Husband]'s efforts at collection." The trial court

---

[7] If the alleged contemnor does not assert the defense of inability to pay, the trial court "assumes from want of dispute that the financial ability of the obligor at the time of the support order [or other judgment] remains the same and this legal conclusion of ability to pay suffices as a basis for the judgment and commitment." ***State ex rel. Watkins v. Watkins***, 972 S.W.2d 609, 611 (Mo. App. S.D. 1998).

found that Ex-Wife "elected to pay $140,000.00 toward the debt [on Kensington Park Investments] as a 25% owner of the business . . . . [when] [t]here was no requirement that she do so[.]" The trial court found that Ex-Wife "agreed to transfer 24% . . . of [Kensington Park Apartment Homes] to her brothers for the total sum of $45,000.00" and she "sold her interest in [Kensington Park Investments] to her brothers for $20,000.00" when she "had invested $140,000.00 in [it] only six months earlier." These findings[8] are supported by substantial evidence that Ex-Wife's actions in not paying Ex-Husband were intentional and contumacious.

Ex-Wife argues that she made the transfers "[i]n order to eliminate her obligation to make ongoing principal payments which she could not afford, and to improve her overall financial position and cash flow,"[9] that the payment of $140,000 was demanded by the bank, that the appraised value of the apartment complex had diminished substantially, that the debt against the Kensington Park Apartment Homes was greater than its value, and that her interests in the companies were not marketable.[10] All of these assertions ignore our standard of review; the trial court was entitled to disbelieve the evidence supporting them. *See White*, 321 S.W.3d at 305.

Ex-Wife submits *Fugitt v. Fugitt*, 850 S.W.2d 396, 397 (Mo. App. S.D. 1993), as a similar case in which the appellate court affirmed the trial court's refusal to find contempt.[11]

---

[8] With the caveat that Ex-Wife conveyed a 24% interest in Kensington Park Investments instead of her full 25% interest.

[9] Ex-Wife offered similar testimony at trial and testified that her brothers had agreed to pay her a salary of $75,000 per year to work for Kensington Park Apartment Homes.

[10] Ex-Wife offered similar testimony at trial, including that the refinanced debt on the land was $668,615.61 before it was paid down with her payment of approximately $140,000 and her brothers' payment of approximately $52,000. Ex-Wife's balance sheet for Kensington Park Apartment Homes was also admitted into evidence and it included a negative equity figure. An appraiser testified on behalf of Ex-Wife that the value of the apartment complex was "$14.9 million" and that the value of the vacant land was $640,000.

[11] Ex-Wife also relies on *Caldwell v. Caldwell*, 341 S.W.3d 734, 735-36 (Mo. App. E.D. 2011) reversing a contempt and commitment order. In that case, "[t]he judgment of contempt and the commitment order

13

After stating that "[i]f this court had been the initial trier of fact, it might have ruled otherwise[,]" the *Fugitt* court affirmed, deferring to the trial court's discretion to find the facts. *Id.* at 400. It therefore illustrates the principle that "'[a] motion for civil contempt is addressed to the sound discretion of the trial court, and on review its judgment will not be disturbed in the absence of a clear abuse of discretion.'" *Id.* at 399 (quoting *In re Mayfield*, 780 S.W.2d 139, 144 (Mo. App. S.D. 1989) (internal citations omitted)). Here, the trial court did not find credible Ex-Wife's assertions that she had to spend her cash as she did.

The trial court did not abuse its discretion in finding that Ex-Wife either: 1) had the ability to comply with the dissolution judgment and simply refused to do so; or 2) willfully and contumaciously placed herself in a position of inability to pay it. Point I is denied.

*Point II – Commitment*

Ex-Wife's second point contends the trial court abused its discretion in finding that she had the present ability to purge herself of contempt because it was "not supported by substantial evidence and . . . misapplied or misdeclared law [sic]. . . in that [Ex-Wife]'s income and assets that she owned or had access to . . . were not sufficient to allow her to pay said debt to [Ex-Husband]."

"Commitment may only be ordered for acts capable of being performed by the contemnor." *State ex rel. Nesser v. Pennoyer*, 887 S.W.2d 394, 396 (Mo. banc 1994). (citing *Zeitinger v. Mitchell*, 244 S.W.2d 91, 98 (Mo. 1951)). As a result, incarceration -- unlike an underlying finding of contempt -- is only appropriate if the trial court finds that the contemnor has the present ability to pay the judgment. *Lyons*, 40 S.W.3d at 12; s*ee also Nesser*, 887 S.W.2d at 396; *Caldwell*, 341 S.W.3d at 736; and *Mischeaux v. Hais*, 939

---

themselves state[d] only conclusions, not facts, and, therefore, [we]re facially insufficient." *Id.* at 736-37. In this case, there were detailed findings of fact in the contempt judgment concerning Ex-Wife's intentional and contumacious actions.

S.W.2d 49, 50 (Mo. App. E.D. 1997).[12] "Otherwise, the [trial] court must set forth a different method for the contemnor to purge himself of the contempt." *Lyons*, 40 S.W.3d at 12 (citing *State ex rel. Div. of Family Services v. Bullock*, 904 S.W.2d 510, 514 (Mo. App. S.D. 1995)).

In *Nesser*, the Court found that while the order cited the husband's "failure to make *past* payments of maintenance and child support[,]" "the commitment order [was] invalid for failure to address [the husband]'s ability to pay delinquent maintenance and child support." 887 S.W.2d at 397. In *Lyons*, the Western District noted that "the findings necessary to support a judgment of contempt are different from those necessary to support an order of commitment[.]" 40 S.W.3d at 10. It stated that the first step on review is to "determin[e] whether the judgment of contempt was proper." *Id.* The second step is to then "determine whether the trial court's order of commitment was proper." *Id.* at 11. Following an Eastern District line of cases,[13] the Western District held

> that in order to support an order of commitment, a trial court must make a finding that the contemnor has the present ability to purge himself of the contempt and thereby has the key to the jailhouse door. Otherwise, the court must set forth a different method for the contemnor to purge himself of the contempt.

---

[12] We could find only one Missouri case suggesting that something less than a present ability to purge is sufficient to support an order of commitment.

> On the facts the trial court was justified both in finding husband contumaciously placed himself in a position where he would not be able to pay child support and in ordering husband committed until he purged the contempt. The evidence indicates the possibility husband may never have the assets to purge the contempt. Accordingly, the judgment is modified by adding: "This Court shall retain jurisdiction until the contempt has been purged. In the event husband shall be unable to purge himself of contempt within a reasonable time, this Court shall then consider the viability of a work-release program, pay-back plan or other alternative method of purging the contempt."

*Johnson v. Johnson*, 722 S.W.2d 136, 139 (Mo. App. E.D. 1986).

[13] The court cited *In re Brown*, 12 S.W.3d 398, 401 (Mo. App. E.D. 2000); *Mischeaux*, 939 S.W.2d at 50; and *State ex rel. Barth v. Corrigan*, 870 S.W.2d 458, 459 (Mo. App. E.D.1994). *Id.* at 12.

15

*Id.* at 12; *see also Bullock*, 904 S.W.2d at 514 ("imprisonment for civil contempt is not justified" unless the alleged contemnor "has the means to secure release"). Although there was evidence that would have supported a finding that the alleged contemnor had the present ability to pay the $5,000 owed, the court remanded the case because "no such finding was made in the judgment or order of commitment[.]" *Lyons*, 40 S.W.3d at 15.

In *Mischeaux*, the Eastern District stated, "The contemnor must have the ability to purge himself to justify imprisonment for civil contempt." 939 S.W.2d at 50. Although the trial court found that "the prior two orders and judgments relate[d] to [the] father's financial status at those prior respective times[,]" there was no record of the father's "present financial status" at the time of the commitment order. As a result, the Eastern District directed the trial court to discharge the father from custody. *Id.* at 51.

"If a contemnor is to be imprisoned for failing to pay money pursuant to a court order, in order to assure he has the means to secure release, the contemnor must have the ability to purge himself of his contempt." *Caldwell*, 341 S.W.3d at 736. This is because "[t]he purpose of civil contempt, as contradistinguished from criminal contempt, is to remedy, not to punish: it is to enforce obedience to a judgment by a party the judgment intends to benefit." *Wisdom v. Wisdom*, 689 S.W.2d 82, 86 (Mo. App. W.D. 1985). "The sanctions which follow a judgment of civil contempt, being to coerce compliance, necessarily contemplate that the contemnor retains the power to terminate the sanction by the act of compliance." *Simmons v. Megerman*, 742 S.W.2d 202, 204 (Mo. App. W.D. 1987). "Absent the ability to pay, the coercive purpose for civil contempt is frustrated because the contemnor has no key to the jailhouse door." *Sample ex rel. Sample v. Saffaf*,

16

87 S.W.3d 903, 907 (Mo. App. E.D. 2002). Further, the past ability to pay "does not equate to a finding that [the contemnor] had the present ability to pay." *Id.*

Here, the delay in the proceedings between May and October is attributable to Ex-Wife's actions in filing a bankruptcy proceeding which was ultimately dismissed for reasons that could be viewed as additional evidence of her contumacious conduct. Nonetheless, we find no authority for the proposition that even a bad-faith delay negates the requirement that the contemnor has the ability to purge his or her contempt at the time commitment is ordered.

The commitment judgment in the instant case did not expressly find that Ex-Wife had the ability to purge herself of contempt at the time her incarceration was ordered.[14] Even if the commitment judgment had unambiguously done so, a reversal would still have been required because no such evidence was before the trial court.[15] The commitment judgment's incorporation of findings set forth in the October 2012 contempt judgment based

_____

[14] Instead, the commitment judgment found that Ex-Wife "has had and continues to have the ability to comply with the [contempt judgment] and has failed and refused to do so *and/or* [*Ex-Wife*] *has willfully and contumaciously placed herself in a position of inability to pay* the [contempt judgment]." (Emphasis added.) The use of "and/or" generally "leads to uncertainty and confusion" and is rightly condemned. *State ex rel. Adler v. Douglas*, 95 S.W.2d 1179, 1180 (Mo. banc 1936). Because the two findings separated by the "and/or" in the instant case are mutually exclusive, the conjunction can only mean "or." As a result, a remand would have been required even if evidence of Ex-Wife's ability to purge at the time of her ordered commitment had been presented as we could not have determined from the commitment judgment whether the only legally permissible basis for commitment -- that Ex-Wife had the present ability to purge herself at the time of her ordered commitment -- was the basis upon which her commitment was actually ordered.

[15] Ex-Husband argues that Ex-Wife "waived any argument regarding the language or alleged lack of findings in the judgment" by not raising an "argument concerning the language of the [commitment judgment] at or after the time that it was entered[,]" citing *Sneil, LLC v. Tybe Learning Ctr., Inc.*, 370 S.W.3d 562, 574 (Mo. banc 2012). *Sneil* is distinguishable because the appellant argued that the trial court erred in not "making material findings of fact and conclusions of law as it requested" before trial. *Id.* at 573. The Supreme Court rejected the appellant's attempt to characterize this challenge as going "to the substance of the judgment[,]" stating, "This argument is unconvincing in that Rule 78.07(c) by its plain language indicates that findings, such as those required by a statute, are related to the form of the judgment." *Id.* at 574. Rule 78.07(c) requires that "allegations of error relating to the form or language of the judgment . . . be raised in a motion to amend the judgment in order to be preserved for appellate review." Here, Ex-Wife's point relied on is not restricted to a challenge to the "form or language of the judgment[.]" It states substantive claims that the commitment judgment was not supported by substantial evidence and that the trial court misapplied the law by not deciding whether Ex-Wife had the ability to purge her contempt at the time of her incarceration.

on evidence received in April 2012 did not establish Ex-Wife's ability to meet the purge conditions nine months later.  Point II is granted.

## Decision

The contempt judgment is affirmed.  The commitment judgment is reversed, and the matter is remanded for additional proceedings consistent with this opinion.  *See **Anderson v. Anderson***, 91 S.W.3d 137, 141 (Mo. App. E.D. 2002) (remanding the case for further proceedings as former spouse still owed "a significant amount of back maintenance").


DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS